U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2013 MAR 26 PM 12: 29
CLERK
BY_____ DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA )
)
v. ) Case No. 5:12-cr-100
)
SAMUEL SERGI )

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION TO SUPPRESS STATEMENTS
(Doc. 22)

This matter came before the court on January 22, 2013 for an evidentiary hearing on Defendant Samuel Sergi's motion to suppress statements. (Doc. 22.) The parties completed their post-hearing filings on February 7, 2013.

Defendant is charged in a two-count indictment with knowingly distributing visual depictions involving a minor engaging in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(2), and knowingly possessing visual depictions involving a minor engaging in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(4)(B).

Defendant seeks suppression of statements he made to law enforcement officers during an interview at his residence, arguing that he was the subject of a custodial interrogation without the benefit of *Miranda* warnings. The Government opposes the motion.

The Government is represented by Assistant U.S. Attorney Christina E. Nolan. Defendant is represented by Assistant Federal Public Defender David L. McColgin.

### I. Findings of Fact.

On August 7, 2013, at approximately 9:00 a.m., Federal Bureau of Investigation ("FBI") Special Agents Jennie Emmons and Wayne Shuptrine, accompanied by approximately five other FBI Special Agents, two additional FBI support staff, and two Brattleboro Police Officers, approached Defendant's residence at 27 Lawton Drive, Brattleboro, Vermont to execute a search warrant. Agent Emmons described the

residence as "a smaller size single family residence." (Doc. 29 at 7.) Agent Shuptrine knocked on the door of the residence, announced that he was with the FBI and that he had a search warrant to search the residence, and requested that the door be opened.

Defendant opened the door. Initially, only four to five law enforcement officers physically entered the residence; it is unclear if and when the remaining law enforcement officers did so. The FBI agents all had weapons, which were holstered, and were wearing protective vests that read "FBI" across the chest. Prior to executing the search warrant, Agent Emmons was aware that Defendant, Defendant's wife, and Defendant's adult son, M.S., occupied the residence. At the time, law enforcement did not know the identity of the person allegedly offering child pornography on the Internet. Agent Emmons testified that upon entry into the residence, her initial impression was that M.S. was the more likely suspect because of the concerned expression on his face, "whereas Samuel Sergi expressed some outrage and made a comment, [']what is this Nazi Germany[?']" *Id.* at 11.

After law enforcement officers entered the residence, Defendant and his family were asked to stay in the living room, seated on the couch, while officers conducted a protective sweep of the residence to identify weapons and occupants, which lasted approximately two to five minutes. During the protective sweep, Agent Emmons acknowledges that "they were not free to leave[.]" *Id.* at 27. It is not clear how, or if, this was communicated to Defendant.

Following the protective sweep, the law enforcement officers began preparing for and searching the residence, while Defendant and his family remained seated in the living room. Agent Emmons found a bedroom in the back of the house and, at approximately 9:30 a.m., told Defendant that she and Agent Shuptrine wanted to speak with him in the bedroom. It is not clear whether this was phrased as a request or an order.[1] Defendant, Agent Emmons, and Agent Shuptrine walked to the back bedroom. Agent Shuptrine or Agent Emmons never touched Defendant, and he was not physically restrained in any

---

[1] Because Defendant did not testify, law enforcement's version of the events is the only evidence before the court.

2

manner. It appears that they did not advise Defendant that he was free to decline to accompany them to the bedroom.

The bedroom where Defendant was interviewed was approximately ten feet by ten feet with a queen or full size bed. Defendant sat on the bed. Agent Emmons sat in a chair next to the bed closer to the door than Defendant. Agent Shuptrine sat in a chair at the end of the bed, approximately three feet from the door, but not blocking it. Agent Emmons asked Defendant questions during the interview and Agent Shuptrine took notes. During most of the interview, the door to the bedroom remained closed, although there were several breaks in the interview during which Agent Emmons left the bedroom. Defendant was also permitted to leave the bedroom, but when he did so an agent accompanied him.

At the commencement of the interview, Agent Emmons explained to Defendant that law enforcement had a search warrant for his residence based on evidence that child pornography was being transmitted from the location. Defendant immediately responded that he was the person responsible and that he had downloaded, viewed, and erased child pornography. Agent Emmons asked follow-up questions in response to Defendant's admission. Approximately ten minutes after the interview began, Agent Emmons informed Defendant that the interview was voluntary, that Defendant was not under arrest, and that he was free to leave. Defendant responded with skepticism, expressing disbelief that he was free to leave. At this point, Agent Shuptrine offered to open the door, and Agent Emmons reiterated that the interview was voluntary. Defendant agreed to keep talking to the agents.

Early in the interview, Defendant was allowed to go to the kitchen for a pack of cigarettes. Agent Emmons escorted Defendant to the kitchen for this purpose. Agent Emmons testified that the occupants of the home were not allowed to roam freely in the house during the search due to concern for the safety of the law enforcement officers searching and to prevent the destruction of evidence. Upon returning to the bedroom, Defendant smoked a cigarette. Before resuming the interview, Agent Emmons reminded

Defendant that the interview was voluntary, that he was not under arrest, and that he was free to leave.

At some point during the interview, Defendant went into the living room and spoke with his wife. During this time, no law enforcement officers questioned Defendant; however, at least one law enforcement officer in the living room remained in close proximity to Defendant and was able to hear Defendant's conversation with his wife. On two to three additional occasions, Agent Emmons left the bedroom, and the interview ceased. In her absence, Agent Shuptrine remained with Defendant and spoke to him regarding unrelated topics. Defendant was never left alone in the bedroom. Each time, upon Agent Emmons's return, she explained to Defendant that the interview was voluntary, that he was not under arrest, and that he was free to leave.

The tone of the interview was conversational, and Agents Emmons and Shuptrine neither raised their voices at any time nor became confrontational toward Defendant. They did not threaten Defendant or engage in trickery or deceit.

The interview lasted until approximately 12:10 p.m., totaling just over two and a half hours. It ended when Defendant asked if he was going to be arrested. Agent Emmons responded that she would have to check, and left the room to speak with an Assistant U.S. Attorney. After doing so, Agent Emmons returned and informed the other law enforcement officers and Defendant that he would be arrested.

## II. Conclusions of Law and Analysis.

Defendant argues that he was in custody throughout the entire interrogation, and therefore was entitled to *Miranda* warnings. The Government asserts that Defendant was not in custody at any point during the interrogation. Moreover, even if Defendant was in custody, the Government claims his initial statement, that he was responsible and that he had downloaded, viewed, and erased child pornography, was not the product of an interrogation, as law enforcement had not asked Defendant any questions up to that point.

Under *Miranda*, a law enforcement officer may not interrogate a suspect who has been taken "into custody" without first warning the suspect that he or she:

4

has the right to remain silent, that anything he says can be used against him
in a court of law, that he has the right to the presence of an attorney, and
that if he cannot afford an attorney one will be appointed for him prior to
any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966). If no *Miranda* warning is given to a suspect in custody, the prosecution may not use statements obtained during an interrogation in its case-in-chief. *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004).

"A criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation." *United States v. Ramos*, 2012 WL 1854747, at *11 (D. Vt. May 21, 2012); *see also United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (affirming district court's dismissal of defendant's *Miranda* claim because defendant "failed to demonstrate that he was subjected to custodial interrogation"); *United States v. Davis*, 792 F.2d 1299, 1308 (5th Cir. 1986) ("[Defendant] had the burden of proving that he was under arrest or in custody[.]").

The question of "whether a suspect is 'in custody' is an objective inquiry," *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011), and "focuses upon the presence or absence of affirmative indications that the defendant was not free to leave." *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (quoting *United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir. 1995)). The court must consider the circumstances surrounding the interrogation, and determine "given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B.*, 131 S. Ct. at 2402 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

> Those circumstances include, inter alia, the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion[.]

*United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011). "The free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody."

*Newton*, 369 F.3d at 670. "The 'ultimate inquiry' for determining *Miranda* custody . . . [is] 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)).

"Lower courts . . . almost universally hold that questioning in a suspect's home is not custodial because individuals in a familiar environment are less likely to be intimidated by law enforcement officers." *United States v. Rakowski*, 714 F. Supp. 1324, 1334 (D. Vt. 1987) (collecting cases); *see Beckwith v. United States*, 425 U.S. 341, 347 (1976) (finding that an interview in defendant's own home did "not present the elements which the [*Miranda*] Court found so inherently coercive as to require its holding"); *Newton*, 369 F.3d at 675 ("Moreover, absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial."); *see also United States v. Bassignani*, 575 F.3d 879, 885 (9th Cir. 2009) ("We have held that an interrogation conducted in familiar surroundings weighs against a finding that the defendant was in custody.").

However, the lessened risk of coercion in a familiar setting "does not allow for a simple in-home vs. out-of-home dichotomic analysis," *United States v. Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012), because "[t]o look only at any single factor would be inconsistent with *Miranda*'s role as a protection against coercion . . . in a police-dominated atmosphere." *FNU LNU*, 653 F.3d at 154 (internal quotation marks omitted). Instead, "when applying *Miranda* to the task of sorting a non-custodial in-home interrogation from a custodial one, [the court's] analysis considers the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'" *United States v. Craighead*, 539 F.3d 1073, 1083-84 (9th Cir. 2008) (listing factors relevant to determining whether there was a police-dominated atmosphere as "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was

isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made").

Defendant points to a number of factors supporting his argument that a reasonable person in his position would not have felt free to leave. First, the law enforcement officers initially instructed Defendant and his family to stay in the living room while they conducted a protective sweep, and thereafter did not inform Defendant that the restriction on his freedom of movement had ended. Moreover, Agent Emmons testified that, at least during the protective sweep, Defendant would not have been allowed to leave the residence. Such limitations on movement can, in some instances, be evidence of a custodial interrogation when, for example, a defendant is confined by law enforcement and is "not free to go where he pleased." *Orozco v. Texas*, 394 U.S. 324, 325 (1969) (finding defendant in custody when defendant was awakened at 4:00 a.m. by four law enforcement officers who questioned him while he lay in bed, the court noted that "[f]rom the moment he gave his name, according to the testimony of one of the officers, petitioner was not free to go where he pleased but was 'under arrest'"). A temporary limitation on movement does not, however, necessarily render an interrogation custodial. *See United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003) (per curiam) (affirming the district court's finding "that a reasonable person would have understood that he or she was not in custody" when "[d]efendant and his wife were asked to stay seated in the living room and not allowed to move freely about the apartment"); *United States v. Groezinger*, 625 F. Supp. 2d 145, 158 (S.D.N.Y. 2009) (finding no custodial interrogation despite law enforcement officers directing defendant to sit in the kitchen, remaining with him and blocking his access to the exit, directing him to "sit down" when he tried to get up, and informing him "that he was going to be late" when he told them he needed to leave for a meeting).

Second, Defendant notes that, prior to Agent Emmons's advice approximately ten minutes into the interview, he was not advised that he was free to leave, was not under arrest, and could refuse to participate in the interview. Providing such advice would have strongly supported a conclusion that the interrogation was not custodial, *see Howes v.*

7

*Fields*, 132 S. Ct. 1181, 1194 (2012) ("Taking into account all of the circumstances of the questioning – including especially the undisputed fact that respondent was told that he was free to end the questioning and to return to his cell[,]" an inmate who was questioned for five to seven hours in the jail's conference room was not in custody), but the lack of such advice is not determinative. *See United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) ("Decisions in this Circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave."); *see also United States v. Weisinger*, 2012 WL 6164306, at *5-6 (D. Vt. Dec. 11, 2012) (concluding that defendant was not in custody notwithstanding the fact that "the agents did not advise Defendant that he was free to refuse their request or free to leave"). Although Defendant was not initially affirmatively advised of his right to leave, the law enforcement officers never "act[ed] or sp[oke] in a manner that conveys the message that they would not permit the accused to leave[.]" *Campaneria v. Reid*, 891 F.2d 1014, 1020 n.1 (2d Cir. 1989).[2]

Third, Defendant points to the circumstances of the interrogation itself. He notes the small size of the bedroom and the fact that the FBI agents arguably sat between Defendant and the door. *See United States v. Robinson*, 833 F. Supp. 2d 406, 411 (D. Vt. 2011) (noting that defendant was "questioned in a small room . . . by more than one officer, with the door closed, through which she could see other officers in the lobby" and that defendant was denied access to the bathroom but was escorted by officers outside to

---

[2] Defendant points out that he expressed his subjective belief that he was not free to leave when Agent Emmons advised him that the interview was voluntary. The Government, on the other hand, points out that Agent Emmons initially suspected that M.S., not Defendant, was the more likely suspect. However, custody for *Miranda* purposes is an objective inquiry, so the inquiry is not dependent upon "the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). Therefore, Defendant's subjective belief regarding his right to leave "is not dispositive but may shed light on the objective tenor of the encounter[.]" *Ligon v. City of New York*, 2013 WL 227654, at *3 n.25 (S.D.N.Y. Jan. 22, 2013). Similarly, Agent Emmons's initial suspicion that Defendant was not the target of her investigation does not render her interrogation noncustodial; however, it provides credence to her testimony that she intended her interview with Defendant to be voluntary.

smoke a cigarette, the court determined that interrogation was custodial). He also points to the large number of law enforcement officers present at his residence, and the requirement that Defendant be escorted whenever he sought to move about his own home. It is true that "[a] reasonable person interrogated inside his own home may have a different understanding of whether he is truly free 'to terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search." *Craighead*, 539 F.3d at 1083-85; *see also Cavazos*, 668 F.3d at 194 (noting that "more than a dozen officers entered and searched [defendant's] home[,]" the court found defendant's interrogation was custodial); *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (concluding defendant was in custody when, among other factors, eight officers entered the home); *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007) (finding a reasonable person "would have perceived a police-dominated atmosphere" when "seven police officers abruptly roused [defendant and her boyfriend] from their bedroom after forcibly entering their home").

    However, while eleven law enforcement officers were present for the search, the evidence reveals that only four to five apparently entered Defendant's residence. There is no evidence before the court regarding how long they remained there. With respect to the law enforcement escort, Agent Emmons testified that it was for the purpose of preventing the destruction of evidence and maintaining officer safety. There is no evidence of how closely law enforcement accompanied Defendant during these escorts, and there is no evidence that the officers touched, restrained, or otherwise impeded Defendant's freedom of movement. *See United States v. Kirsteins*, 906 F.2d 919, 924 (2d Cir. 1990) (acknowledging that the defendant was escorted to the street and back during a break in questioning, the court nonetheless found that "it did not rise to the level of custodial supervision" because "[t]he attorney [who escorted defendant] never touched [defendant] or physically impeded his movements in any way"); *United States v. Ross*, 719 F.2d 615, 622 (2d Cir. 1983) ("The mere fact that [suspect] was told he would be accompanied by an IRS agent when he moved about the [place of interrogation] did not place him in custody within the meaning of *Miranda*[.]").

While Defendant presents an exceedingly close question as to whether a reasonable person in his position would feel free to leave or terminate the interrogation, there is far less evidence that Defendant's freedom of movement was restrained to a degree commensurate with a formal arrest. Defendant was neither handcuffed nor subjected to any other physical restraints before or during the interrogation. *See Newton*, 369 F.3d at 676 ("Handcuffs are generally recognized as a hallmark of a formal arrest."); *compare United States v. Filipowski*, 2009 WL 959949, *3 (D. Vt. Apr. 3, 2009) (noting that the suspect was never placed in handcuffs when concluding that a reasonable person in his position would not consider himself subject to a formal arrest), *with Cavazos*, 668 F.3d at 195 (supporting its conclusion that defendant was in custody, the court explained "[w]hile the handcuffs were removed prior to interrogation, the experience of being singled out and handcuffed would color a reasonable person's perception of the situation and create a reasonable fear that the handcuffs could be reapplied at any time").

Although Defendant entered the bedroom at Agent Emmons's request, there is no evidence that she ordered him to join her, and she did not physically touch him, threaten him, or make a display of force while escorting him to the room. *See United States v. Quilter*, 2012 WL 1410322, at *3 (D. Vt. Apr. 23, 2012) ("Hallmarks of seizure include 'threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'") (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

Similarly, while the law enforcement officers were armed throughout the interview, they did not unholster or display their weapons. *Compare Badmus*, 325 F.3d at 139 (finding that the defendant was not in custody when officers had visible, holstered guns), *and United States v. Patt*, 2008 WL 2915433, at *16 (W.D.N.Y. July 24, 2008) (finding defendant was not in custody, the court explained that "the agents' weapons remained holstered during his encounter with them"), *with Mittel-Carey*, 493 F.3d at 40 (explaining "that the defendant was confronted with an unholstered gun in his darkened bedroom" as a factor important to determining defendant was in custody).

10

Although Agents Emmons and Shuptrine questioned Defendant in a separate bedroom away from his family, he was allowed to smoke during the interview and to consult with his wife during a break. *See United States v. Ivers*, 430 F. App'x 573, 575 (9th Cir. 2011) (noting that "[t]he agents also allowed [defendant] to speak with his wife over the phone" in support of conclusion that "[a] reasonable person in [defendant's] situation would have felt free to end the conversation and leave"); *United States v. Maneti*, 781 F. Supp. 169, 185 (W.D.N.Y. 1991) (determining that the suspect was not in custody, the court cited, among other factors, that he was never restrained and was able to speak freely to members of his family); *Rakowski*, 714 F. Supp. at 1335 (noting that the "defendant was allowed to make two phone calls, including one private call," in support of its conclusion that he was not in custody). There is no also evidence that law enforcement monitored Defendant's conversation with his wife or insisted that he speak with her so that law enforcement could overhear the conversation. *See Cavazos*, 668 F.3d at 194 (noting that suspect was separated from his family and his phone call was monitored, as one factor in determining that a reasonable person would not feel free to terminate the interrogation and leave).

Finally, the law enforcement officers did not make any threats or promises to Defendant in order to gain his cooperation. *See United States v. Guarno*, 819 F.2d 28, 32 (2d Cir. 1987) (pointing out that "the agents did not threaten [suspect] with arrest if he refused to cooperate[,]" the court concluded that suspect was not in custody); *United States v. Akin*, 435 F.2d 1011, 1013 (5th Cir. 1970) (citing, among other factors, that no "promises [were] made to induce [suspect] to give any information," in support of conclusion that no custodial interrogation occurred). Instead, they questioned Defendant in a conversational manner and did not raise their voice, accuse him of lying, or otherwise engage in trickery or deceit. *Compare Bassignani*, 575 F.3d at 884-85 (concluding that defendant was not in custody, the court noted that "nearly the entire two and a half hour interview was conducted in an open, friendly tone," and the "questioning was not confrontational"), *with Tankleff*, 135 F.3d at 244 (2d Cir. 1998) (finding suspect was in custody, the court noted that "detectives had accused him of showing insufficient

grief, had said that his story was 'ridiculous' and 'absurd,' and had added that they simply 'could not accept' his explanations").

The Second Circuit has "held that 'in the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" *Guarno*, 819 F.2d at 31-32 (quoting *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969)). Here, Defendant has failed to meet his burden of showing that "his freedom of action [was] 'curtailed to a degree associated with formal arrest.'" *Newton*, 369 F.3d at 671 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). Therefore, the court DENIES Defendant's motion to suppress.[3]

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (Doc. 22) is DENIED.
SO ORDERED.

Dated at Rutland, in the District of Vermont, this 26th day of March, 2013.

Christina Reiss, Chief Judge
United States District Court

---

[3] Finding that Defendant was not in custody during the interrogation in his home, the court need not reach the question of whether his initial inculpatory statement was the product of interrogation. It notes, however, that the Second Circuit has explained that "courts have not endorsed the proposition that 'statements by law enforcement officials to a suspect regarding the nature of the evidence against the suspect constitute interrogation as a matter of law[.]'" *Acosta v. Artuz*, 575 F.3d 177, 191 (2d Cir. 2009) (quoting *United States v. Payne*, 954 F.2d 199, 203 (4th Cir. 1992)); *see also United States v. Davis*, 2011 WL 2936123, at *7 (W.D.N.Y. July 18, 2011) ("[T]he recitation of charges that a suspect in custody faces does not amount to interrogation.").

12